[No. 1756.]

## Bill Bell v. The State.

1. Murder — Self-defense — Charge of the Court.— When the evidence in a murder trial raises the issue of self-defense, it becomes the duty of the court to give in charge the law, and all of the law, applicable to that issue, whether requested so to do or not. It is a part of the law of self-defense,

under the Code of this State, that an assailed party is not bound to retreat in order to make good his right of self-defense. Failure to so charge is error which, if excepted to, necessitates the reversal of a conviction. It will not, however, be such error, if not excepted to, and for the first time questioned in a motion for new trial, unless under the evidence adduced it was calculated to prejudice the rights of the accused. See the opinion *in extenso* for a state of case wherein the failure of the trial court to charge to the extent indicated was calculated to injure the rights of the accused, and was therefore reversible error independent of exception.

2. SAME.— An accused cannot be considered to have waived his right to a full and correct charge upon an issue raised by the evidence, because his requested charge was not as full as the law requires, nor is the trial court for such reason relieved of its duty to give a full and correct charge. See the opinion *in extenso* for a special charge on the law of self-defense *held* correct so far as it goes, and sufficient to call such issue to the attention of the trial court, and exact therefrom a full and proper charge.

3. SAME — INTENT.— In its main charge upon the subject of intent, the court instructed the jury in substance that if the evidence satisfied their minds beyond a reasonable doubt that the manner in which the knife was used evinced an evil or cruel disposition, or an intention on the part of the defendant to kill, they should find him guilty of murder or manslaughter according to the facts of the case. After the delivery of the main charge and the charges requested by the defendant, and as the jury were about to retire, the court, upon the request of the State, charged as follows: "If the jury believe from the evidence that Bill Bell did cut and wound A. T. Moreland with a knife, and said act was not done in self-defense as defined in the charge already given, and that the natural and probable consequences of the assault with the knife (if any) was to cause the death of said Moreland, or produce great bodily injury, then the defendant is presumed by the law to have acted with an intent to kill." *Held*, that the main charge was sufficient upon the subject, and that, even if the special charge was abstractly correct, as under the evidence it was not, it was improper to give it, because it gave undue prominence to the presumption arising against the defendant from the character of the weapon, and the manner in which it was used. See the opinion *in extenso* on the subject.

4. SAME — PRESUMPTIONS OF LAW — CASE DISTINGUISHED.— Presumptions of law which are against a defendant should not ordinarily be given in charge to the jury. There are exceptional cases in which it is proper to cast into the scales against the defendant such presumptions, but this case is not of that character. See the opinion for a distinction between this case and that of *Gatlin* v. *The State*, 5 Texas Ct. App., 531.

5. MURDER — FACT CASE.— See the statement of the case for evidence *held* sufficient to support a verdict of murder in the second degree, but not so conclusive as to exclude an inferior grade of homicide.

APPEAL from the District Court of McLennan. Tried below before the Hon. B. W. Rimes.

The indictment charged the appellant with the murder of A. T. Moreland in McLennan county, Texas, on the 28th day of March, 1883. He was convicted of murder in the second degree, and his

punishment was assessed at a term of seven years in the penitentiary.

Mr. Fowler was the first witness for the State. He testified that about 8 or 9 o'clock on the night of March 28, 1883, he, the deceased, Louis Breland and one Harris went from the wagon yard in Waco to the Horse Shoe theater on the corner of Bridge and First streets. The deceased was not drunk but had a pint bottle of whisky with him, from which the witness took one drink. The deceased and Harris left the theater when the performance closed, and about the time that the dancing was about to begin, which was, the witness supposed, about 12 o'clock. Witness and Breland remained about one hour after the dancing commenced, and left to look up the deceased and Harris. About the time they reached the street, deceased and Harris drove up in a hack and got out. The defendant, who was driving the hack, dismounted from his box about the time that the parties named got out. Either the deceased or Harris asked the defendant to name the amount they were indebted to him for hack hire. Defendant replied that they owed him seventy-five cents each. Either the deceased or Harris replied that the charge was not correct; that the defendant had agreed to drive them for fifty cents each. Defendant replied: "Yes, that is so, but that was only to go to one house. You have gone to two houses, and my charge is twenty-five cents extra for the other house." Harris refused to pay the extra twenty-five cents, but deceased, remarking that he would pay it, handed the defendant a dollar and demanded a quarter in change. The defendant told deceased to collect the quarter from his friend (Harris), which would make the charge against both square. This the deceased refused to do, saying that he had nothing to do with his friend's business, and again demanded twenty-five cents in change. Defendant replied that he did not have twenty-five cents in change about his person. Thereupon the deceased became seemingly very angry and excited, and witness took hold of him. Other parties also interfered and tried to get the defendant to give the deceased the quarter. The defendant stood perfectly still, and said several times: "He will get his change directly." Finally the deceased said: "Turn me loose, boys, and you will see some fun." The witness did not, at that time, release the deceased. Some further talk between the parties ensued, and after a time the deceased remarked that he did not intend to allow the defendant to steal that quarter. Thereupon defendant stepped towards but not up to the deceased, and said: "Don't you accuse me of trying to steal a quarter of a dollar."

About the time that the defendant made the remark last quoted, witness released the deceased, and the deceased and defendant ran together. The witness did not know and could not state which of the two was the aggressor, or which struck the first blow. The collision was over in a moment, not more than two or three blows passing between the parties. Some one pulled the deceased back, and it was discovered that he was cut in two places, once in the arm and once over the eye. Deceased was then taken to a physician, who dressed his wounds. He died three days later at the Central City Hotel on Bridge street in Waco. After the deceased was cut, the defendant went into Pugh's saloon on Bridge street, and got a quarter and handed it to some one for the deceased. He then got on his hack and drove off. The defendant appeared very cool throughout the difficulty. Witness did not see him advance upon or strike the deceased. It was impossible for the witness to say who struck the first blow. While standing before the deceased and before any of the blows were struck, the defendant kept both hands in his overcoat pocket. Witness did not see any kind of weapon in the defendant's hand when he struck the deceased. The deceased was not armed. Deceased was over six feet high, and, while not built in proportion, was a well made and well formed man of considerable strength. Defendant made no effort to press the difficulty or to strike the deceased after the latter was pulled back. No one held the defendant.

Louis Breland, the next witness for the State, testified substantially as did the witness Fowler. He stated also that to parties who advised him to pay the deceased the twenty-five cents, the defendant persisted in replying: "He will get his change." Once he said: "He will get his change quick," or get it "d—d quick," the witness could not say positively which. The witness took four drinks with the deceased during the course of the evening.

Doctor J. S. Willis testified, for the State, that about the last of March, 1883, he was called to visit the deceased in his professional capacity, at the Central City Hotel in Waco. Doctor Curtis was the attending physician. Witness did not see the deceased until the day before he died. He found the deceased suffering from two wounds, one over the left eye, and the other in the left arm. The wound in the arm was not a serious one, but on examination after death witness found that the wound over the eye had penetrated the brain through the suture, and caused the death of the deceased, through the intervention of meningitis which was superinduced by the wound. The orifice was less than a half inch in width, indicating

that the wound was inflicted by a very small sharp-pointed instrument. The instrument had passed through the suture (the place where the bones lap) and slightly penetrated the brain proper, going through the membrane that covered the brain. An autopsy was made by witness and Doctors Curtis and Barker, after death, which verified this statement and showed that the instrument penetrated the brain and fractured the skull. In the opinion of the witness, this wound was sufficient to, and did, cause the death of the deceased. Such a wound was not absolutely and necessarily fatal in all cases, but in most instances would, as it did in this case, culminate in inflamation or meningitis and ultimate death. Moreland, the deceased, died from this wound on or about March 31, 1883, in Waco, Texas. Doctor Curtis corroborated the testimony of Doctor Willis, except that he stated that the instrument did not penetrate the brain through the wound over the eye. It severed the membrane.

William Talley was the next witness for the State. He testified that, on the night of March 28, 1883, he was on duty at the suspension bridge in Waco as keeper or night watchman. The bridge mentioned is about seventy-five yards distant from the Horse Shoe theater. About 12 or 1 o'clock on that night the witness heard loud talking and cursing in front of the said theater, and repaired to the spot to ascertain the occasion of the difficulty or disturbance. He found a man whom he afterwards ascertained to be Moreland, the deceased, in a quarrel with the defendant about a matter of change. Deceased demanded twenty-five cents change of the defendant. Defendant said to deceased: "Wait until I settle with this other man." Deceased replied that he had waited for some time, and would wait no longer, and did not intend that defendant should steal that quarter. Defendant, who was then standing by his hack, near the edge of the sidewalk, stepped towards the deceased and said: "Don't you say that I am going to steal a quarter of a dollar," and soon afterwards the defendant and the deceased clinched. Witness could not tell which of the parties moved on the other, or which struck the first blow. The struggle lasted but a few moments, and but few blows passed. When the deceased was pulled off by the parties who interfered, it was found that he was cut in two places. Witness saw no arms on either of the parties. At this point the State rested.

W. W. Sinclair was introduced as a witness for the defense. He testified that he was present and saw the whole of the difficulty which occurred between the deceased and the defendant, in Waco, on the night of March 28, 1883. Witness was not then on duty as a special policeman. He was at Stella Hartridge's house, in North

Waco, about 12 or 1 o'clock on the night mentioned. At about the hour last mentioned the defendant drove up to Stella Hartridge's house with his hack, and three men, the deceased, whom the witness knew, and two others whom he did not know, got out of the hack, and the whole party, including the defendant, went into the house and remained awhile. The deceased was drunk at that time, and was still drinking. He had with him a pint bottle in which there was some whisky. The entire party present took a drink from this bottle, unless the defendant was an exception, which witness did not remember. After passing some time in conversation with the girls at the house, the deceased and his two companions resumed their seats in the hack. Defendant asked witness if he was going to town, and invited him to ride with him on the box. Witness accepted the invitation. When the hack arrived at the Horse Shoe theater, defendant and witness got down from the box, and the three parties inside the hack got out. One of the party asked the defendant what was the amount of his charges. Defendant replied: "Seventy-five cents apiece." Some words about the price ensued, but deceased finally admitted that defendant was correct about the charge, and handed him a dollar. The other party handed the defendant fifty cents. To this last mentioned person the defendant remarked: "You owe me another quarter." Deceased then said to defendant: "I want my change." Defendant replied: "Wait until I settle with this man, and I will give you your change." Deceased got angry, swore at and abused defendant, and said that he would not wait. He started towards the defendant, when the witness stepped up, pushed him back, and told him not to provoke a difficulty. Defendant, who was trying to get a settlement with the other man, walked around his hack twice, when deceased advanced and finally stopped near the sidewalk on which deceased was standing. Witness persisted in trying to satisfy deceased that defendant would give him his change as soon as he could settle with the other parties. In the mean time defendant took some money from his pocket, and remarked that he did not have a quarter in change, but would presently get it and pay it to deceased. About this time deceased said something about the defendant trying to steal the quarter. Defendant thereupon looked up at the deceased and remarked: "Don't say that I am trying to steal a quarter of a dollar." Deceased replied: "Yes, G—d d—n you, you are trying to steal a quarter of a dollar." He then struck at the defendant, and followed him up, striking at him. Defendant backed entirely across the sidewalk, striking back. Witness at this

point rushed in between the parties, threw the deceased back, and stopped the fight. As he threw the deceased back, he saw blood on deceased's face. He saw no blood on the defendant. Defendant then went to Pugh's saloon, and returned with a quarter of a dollar, which he gave to witness, and which witness gave to the deceased. Defendant then drove off with his hack, and witness took deceased to a physician. Witness did not remember whether or not he had a conversation with the defendant on the night of, but after, the difficulty, in which defendant denied that he cut the deceased, nor could he now say that he did or did not so testify before the coroner's jury at the inquest. Defendant did not pursue the deceased, but stopped where the fight ended.

The State, in rebuttal, proposed to introduce an extract from the written evidence of the witness Sinclair before the coroner's inquest. The defense objected upon the ground that the writing was not authenticated by the justice's jurat, and was not properly certified by the justice. The court overruled the objection, and the defense demanded that the entire testimony of the witness Sinclair before the inquest, as it appeared in the instrument, should be read, which was done.

That document reads as follows: " I was present at the occurrence of a difficulty between the defendant and Moreland on Bridge street, Waco, on last Wednesday morning. The defendant drove his hack in front of the Horse Shoe theater, and Moreland and two other gentlemen got out of the hack. After getting out of the hack on the sidewalk, one of the gentlemen — I don't know which — asked the defendant what was the hack bill, and the defendant replied that the bill was seventy-five cents apiece. They had some words about the amount of the bill, but Mr. Moreland finally agreed that the bill was correct and that he would pay it. Moreland then handed the defendant a dollar, and one of the other men handed him fifty cents. To this person defendant said: ' You owe me another quarter.' Moreland then remarked to the defendant, ' I want my twenty-five cents in change.' Defendant told him in reply to wait until he had settled with the other man and he would give him his change. Moreland swore that he would not wait, threw off his coat and started at defendant. Witness interfered, pushed Moreland back, and told him not to have a row. The defendant in the mean time was trying to settle with the other man. Moreland persisted in his attempt to get at the defendant, the defendant in the mean time backing around his hack until he reached the sidewalk again. While this was going on the witness tried to pacify More-

land, assuring him that defendant would give him his change as soon as he settled with the other parties. Moreland then said: 'Well, that's all right;' but, after the parties had gone around the hack and reached the sidewalk, Moreland said something about the defendant trying to steal the quarter. Defendant then looked up and said to Moreland: 'Don't say that I would steal a quarter of a dollar.' Moreland angrily replied: 'Yes, G—d d—n you, you mean to steal that quarter.' At the same time he struck at the defendant and, still striking at him, followed the defendant, who was backing and fencing off the blows. Defendant backed some ten feet off and from the sidewalk, Mr. Moreland following and striking at him. After they got into the street I got in between them and threw Moreland back. I noticed then that Moreland had blood about his face. I kept them apart, but Moreland kept trying to get at defendant again. We got Moreland to the sidewalk finally and examined his wounds. Defendant went to Pugh's saloon and got change for Moreland, handed it to one of the parties, and got on his hack and drove off."

Cross-examined by the State: "The defendant is a cousin of policeman A. D. Bell. When I was on police duty I was with A. D. Bell a great deal. Moreland's first attempt to strike the defendant, which I prevented, was before they went around the hack. I also prevented Moreland from striking the defendant as they went around the hack. I had a conversation with the defendant on the night of the difficulty, and he told me that he did not cut Moreland. I had another conversation with him in which he made the same statement. I think the defendant gave the money (the change) to the tall person with dark beard, whose name sounded to me like 'Brelan.' No other person had a difficulty with defendant at that time and place."

The motion for new trial complained of the main charge in defining murder of the second degree, and in failing to charge properly on the issues of justifiable homicide and self-defense; of the special charge given at the instance of the State; of the admission of the written testimony taken before the coroner's inquest, and of the sufficiency of the evidence to support the verdict.

*Clark & Dyer*, for the appellant. The only errors assigned, to which we invite the attention of the court, are:

1. The court erred in failing to define justifiable homicide in its charge, and submitting proper issues thereon to the jury.

2. The court erred in giving both special instructions asked by the State, for the reasons stated in the motion for new trial.

I. The evidence of the State, as disclosed by the statement of facts, manifests that Moreland, the deceased, was the aggressor throughout. Moreland brought on the difficulty without cause or provocation given him by defendant; prosecuted the difficulty with vehemence, and it was terminated at once when by-standers interfered and seized him. Bell, the appellant, was never the aggressor for a moment, and seems to have done everything in reason to avoid the difficulty. Moreland was a strong man, over six feet in height, and the appellant was a spare and frail young man of about twenty-five years of age. Moreland was in liquor, and the defendant was sober. Moreland and his companions were engaged in painting the town "a cardinal hue;" the defendant was engaged in his lawful avocation. This testimony comes from a source naturally hostile to appellant, because it is detailed by Moreland's friends and boon companions. And yet upon their testimony alone it was incumbent upon the judge to have submitted proper instructions upon justifiable homicide, in his main charge. And when to this is added the clear and convincing testimony of the defense, which manifests a clear and perfect act of pure self-defense, the duty of the court was beyond argument. Yet the court totally ignored the issue of justifiable homicide in its charge, and never alluded to such right on the part of defendant; thereby impliedly informing the jury that in the opinion of the court justifiable homicide did not arise as an issue in the case.

The defendant thereupon hastily prepared a special instruction as to the right of self-defense in case of unlawful attack, but not purposing or intending to cover the entire law as applicable to that branch of the case, but merely to call the attention of the jury to one of the prominent issues in the case, which the court had overlooked, and thereby give the court an opportunity of supplying the omission at length. This charge the court gave, but added nothing to the charge in chief. On motion for new trial, the court held that justifiable homicide properly arose as an issue in the case, but that the instruction asked covered the whole law of that species of homicide. Does it? This charge instructed the jury that if Bell did not intend to kill Moreland, but only intended to defend himself from an unlawful and violent attack which he had reason to believe and did believe was likely to endanger his own life or do him serious bodily injury, then the homicide would be justifiable. If this embraces all the law of justifiable homicide, then our books are vain. Anything said here about the non-necessity of retreat? Yet that is the law, and the jury should always be told so, for it is

a common impression with the laity that the party must be at bay before he can kill in self-defense. Are the jury told that the law permits homicide in self-defense under any circumstances? No. Yet such is the law, and a jury ought to be told so by a judge without asking, because in a proper case the law devolves that duty upon him; and the error of omission is not cured even by a full charge requested, because the jury know that the instruction does not come from the court on its own motion, but is asked by the attorney, and they never pay the same attention to a requested instruction that they do to the main charge.

II. But the chief error committed by the court was in giving the two instructions requested by the State. After having delivered the main charge and the charges asked by defendant, the learned counsel who represented the State by private employment requested two instructions, both of which were given by the court. Let us examine these charges and their effect. The court will understand from reading the testimony that the key-stone of the case was the intention of appellant. If he intended to kill Moreland, he was possibly guilty of murder in the second degree. If he did not intend to kill, and the jury so found, he was not guilty of that offense. The whole case turned upon this issue, and it was of peculiar importance that its right determination should be left to the jury, to be ascertained from the facts before them. The court had charged the jury in chief as follows: " You are further charged that the instrument or means by which the homicide is committed are to be taken into consideration in judging of the intent of the party killing; and in this case you are instructed that if you believe from the evidence that there was no intention on the part of defendant to kill the deceased, but in a moment of passion superinduced by a violent attack from the deceased he struck and stabbed the deceased, and that the weapon used as well as the manner of its use was not calculated to produce death, or if the evidence leaves your minds in a condition of reasonable doubt upon the point that there was no intention on the part of defendant to kill, then you will find him not guilty of the homicide."

The defendant asked a charge nearly similar, based upon Penal Code, art. 612, leaving it for the jury to determine from the evidence whether there was an intention to kill. After these charges were delivered, the State's counsel prepared the following instruction, which the court gave: " If the jury believe from the evidence that the defendant Bill Bell did cut and wound A. T. Moreland, as alleged, and cause his death as alleged with a knife, and said act was not

done in self-defense, as defined in the charge already given, and that the natural and probable consequences of the assault with the knife (if any) was to cause the death of the said A. T. Moreland, or to produce great bodily injury, then the defendant is presumed by the law to have acted with an intent to kill." . This charge of course cut the defendant in twain and left him no hope, as it was intended to do by the learned counsel who drew it; and it produced this mass of contradiction and nonsense which under other circumstances would be farcical: "Gentlemen of the jury," says the court in the main charge, "If you find from the evidence that Bell did not intend to kill Moreland, or have a reasonable doubt upon the point, you will acquit of the homicide." But just as the jury are retiring to examine the evidence bearing on this point and to determine therefrom the fact, the court adds: "But, gentlemen, if you find that Bell cut Moreland with a knife (no matter what kind of a knife), and did not cut him in self-defense as I have defined it (when he had not defined it), and the natural and probable consequence was to produce death, you need not examine the testimony as to an intention to kill. The law relieves you from further inquiry, and presumes that Bell intended to kill." This is the plain English of these charges, and they cannot be distorted or twisted so as to mean anything else. In the charge asked by the State, the court practically annuls the charge in chief, and withdraws the main issue of fact from the jury by telling them that under a state of facts about which there was no contest, it was presumed by the law that the contested fact was against the defendant, and they must so find.

We hesitate not to say that this is not the law, and fortunately for the liberty of the citizen it is not likely to become the law. The law is properly chary of her presumptions in criminal trials, and is rarely disposed to indulge in such luxuries; and when a material, contested issue of fact arises in a case the law never steps in and settles it with a presumption. She leaves the contest to the jury, and they may indulge certain presumptions of fact from other facts established. And she tells the courts to "hands off" and let the juries reach their own conclusions in their own way, and invariably rebukes her courts if they invade the province of the jury. If this charge is not an error, the State will have a good time in prosecuting assaults with intent to murder, and our penitentiaries will soon fill with convicts for that crime; because no man can escape. In this class of cases the intent to kill is a material inquiry for the jury, but hereafter the court need only give the usual charge and then add, "But, gentlemen of the jury, if you believe the defend-

ant cut A. B. with a knife (or shot at him with a pistol), and the natural and probable consequence of cutting with the knife (or shooting with the pistol) was to cause the death of A. B., or produce great bodily injury, then the defendant is presumed by the law to have acted with an intent to kill;" and up goes the defendant.

This charge is pregnant with suggestions and forces us to analyze it further.

1. If Bell cut Moreland with a knife and caused his death.

2. And said act was not done in self-defense.

3. And the natural and probable consequence was to produce death or serious bodily injury.

If these concur, Bell is presumed by the law to have acted with an intent to kill. Conclusively presumed, we suppose is meant. Now Bell might have cut Moreland with a knife, not in self-defense, and the natural and probable consequence might be the death of Moreland or serious bodily injury to him, without Bell being at all culpable. It might have been done *per infortuniam*, in which case Bell would be entitled to sympathy. The knife may have been so insignificant as not to be capable of producing death; in which case the law could not indulge any violent presumption. Bell might have cut Moreland on a part of his person an injury to which could not cause death; in which event no presumption ought arise. The natural and probable consequences of the assault might have been to produce great bodily injury and not death, and the manner in which the knife was used might show to the jury that there was no intention to kill, but simply to disable by such injury; but yet under this iron-clad charge the jury could not indulge their reason and judgment, but were told that the law presumed an intention to kill, no matter what the facts might show to the contrary. If this is not taking from the jury the determination of facts, what is it?

Again, there is a direct assumption of fact in the charge, which was stoutly contested as an issue. " And that the natural and probable consequences of the assault (if any)," etc. What assault? The assault by Bell upon Moreland. Here is an assumption by the court that Bell did assault Moreland. Would it not have been better to have submitted that question to the jury?

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE. It cannot be questioned but that the evidence is sufficient to sustain the conviction. It is not so clear and conclusive of the defendant's guilt, however, as to exclude a lower grade of

homicide than murder in the second degree, or justifiable homicide in self-defense. As we view the evidence, it demanded of the trial court to instruct the jury, 1st. Upon the law of murder in the second degree; 2d. Upon the law of manslaughter; and, 3d. Upon the law of self-defense. In the main charge the court sufficiently, and with substantial correctness, explained to the jury the law of murder in the second degree and of manslaughter.

It omitted entirely to submit the issue of self-defense. To supply this omission, defendant's counsel requested a special instruction in the following language, viz.: "If the jury believe, from all the facts and circumstances in evidence, that, at the time of the difficulty between the deceased Moreland and the defendant Bell, and at the time Bell inflicted the injury which proved fatal (if the jury find that Bell did inflict the injury), that Bell did not intend to kill Moreland, and only intended by his acts to defend himself from an unlawful and violent attack made upon him by Moreland, and used no means in such resistance disproportioned to such attack, considering the relative disproportion in size of the combatants (if there was such disproportion), and Bell had reason to believe and did believe that such attack was likely to endanger his own life, or result in serious bodily injury to himself, then the homicide would be justifiable, and the jury will acquit." This special charge was given, and it constitutes the only charge given to the jury upon the issue of self-defense,— nor did the defendant request any additional charge upon the subject.

At the time of the trial no exceptions were taken by the defendant to the charge of the court or any portion of it, but in his motion for a new trial several objections to it are urged, which are insisted upon in this court, and among them, that "the court erred in failing to define justifiable homicide, and in failing to submit to the jury proper issues arising upon the evidence as to the law of self-defense and justifiable homicide." This objection is, we think, well taken. As far as it goes the special charge we have quoted is correct and applicable to the evidence. It does not, however, go far enough. It does not give *all* the law of self-defense demanded by the evidence. It should have stated that the defendant, if unlawfully attacked by the deceased, was not bound to retreat in order to avoid the necessity of killing him. (Penal Code, art. 573; *Williams* v. *The State*, 14 Texas Ct. App., 102.) This is a very material part of the law of self-defense, and is a statutory innovation upon the common law, and upon the common view of what constitutes self-defense. The common law required the assailed party to "re-

treat to the wall," and this requirement, while it no longer exists as the law of this State, is still believed by many who are unlearned in the law to be in force. In all cases, therefore, where the issue of self-defense arises from the evidence, the jury should be instructed that the assailed party is not bound to retreat in order to make perfect his right of self-defense. And when the evidence presents the issue of self-defense, the law, and *all* the law, applicable to that issue, as made by the evidence, should be given in charge to the jury, whether requested or not. (*Edwards* v. *The State*, 5 Texas Ct. App., 593; *King* v. *The State*, 13 Texas Ct. App., 277.)

When the court omits to do this it is error, and, if excepted to at the time of the trial, the conviction would necessarily be set aside. But if the error be not excepted to, but be called to the attention of the trial court for the first time in a motion for new trial, it will not be cause for reversal unless it should appear to this court that the defendant's rights have probably been injured thereby. (*Gilley* v. *The State*, 15 Texas Ct. App., 287.)

In the case before us, the inquiry therefore arises, did the error of the court, in failing to instruct the jury that the defendant was not bound to retreat, probably weaken his plea of self-defense, and prejudice his legal rights in respect thereto? In view of the evidence in the case, we must say that in our opinion it was calculated to have that effect. It was within the power of the defendant to have retreated, and by this means to have avoided the necessity of killing the deceased. It may have been the opinion of the jury that he should have retreated, and that, as he did not in this way avoid his assailant, he was not justified in slaying him. They should have been told by the court that the law of this State does not require retreat under any circumstances. By giving the special charge requested, the trial judge conceded, and we think correctly, that the issue of self-defense was presented by the evidence, and this special charge called his attention to that issue, and, being imperfect, it was the duty of the court to supply its defects by additional instructions. Because the charge as requested was not as full as the law required, should not, we think, be regarded as a waiver by the defendant of his right to a full and correct charge, and should not be held to relieve the court of the duty of giving such charge. Considering the evidence in this case, we think the failure of the court to give in charge article 573 of the Penal Code was material error calculated to injure the rights of the defendant, and is therefore reversible error although not excepted to at the time of the trial.

After the court had delivered its charge, and the special charges requested by the defendant's counsel, and as the jury were about to. retire to consider of their verdict, counsel for the State requested the following special instruction, which was given, viz.: "If the jury believe from the evidence that the defendant, Bill Bell, did cut and wound A. T. Moreland with a knife, and said act was not done in self-defense as defined in the charge already given, and that the natural and probable consequence of the assault with the knife (if any) was to cause the death of said Moreland, or produce great bodily injury, then the defendant is presumed by the law to have acted with an intent to kill." In the main charge the court had already instructed the jury that if the evidence satisfied their minds beyond a reasonable doubt that the manner in which the knife was used evinced an evil or cruel disposition, or an intention on the part of defendant to kill, they should find him guilty of murder or manslaughter according to the facts of the case. We think the main charge of the court was sufficient upon this subject. Even if the special charge was abstractly correct, it was improper to give it, because it gave undue prominence to the presumption arising against the defendant from the character of the weapon and the manner in which it was used.

But we are not prepared to say that the special charge was even abstractly correct, especially in view of the evidence in the case. It was not shown clearly that the wounds inflicted upon deceased were inflicted with a knife, and, if with a knife, that it was such an one as was calculated ordinarily to produce death or serious bodily injury, when used in the manner and under the circumstances here shown. There were but two wounds upon deceased, one in the arm, which was slight, and the other in the temple above the eye, which proved fatal. These wounds were made with some sharp pointed instrument and were small. It is quite reasonable to infer that the wounds were made with a knife, but still the testimony does not place this conclusion beyond doubt. If made with a knife, evidently it was a small one, as demonstrated by the small size of the wounds. The fatal wound was fatal because perhaps of its locality. The instrument used penetrated at the suture or lap in the skull bone, fracturing the bone to some extent, and wounding the brain, producing meningitis which caused death. Had the blow fallen on almost any other portion of the body it might not have been serious, much less mortal. Therefore, the fact that the wound produced death does not of itself warrant the deduction that the instrument used was of a character calculated ordinarily, when so used, to produce death or serious bodily injury.

It is not every *knife* that is a deadly or even a dangerous weapon, and yet with any kind of a knife it is possible, no doubt, to produce death or serious bodily injury. A small sewing needle is not an instrument that could be considered deadly or dangerous, and yet one skilled in human anatomy might, under favorable circumstances, use it with fatal effect, or it might be so used accidentally, or without any intention to kill or seriously injure. Considering the absence of any evidence, except the fatal result of the wound, to show the deadly or dangerous character of the weapon used, we are of the opinion that the special charge is not even abstractly correct when viewed with reference to the facts of this case, and that under the circumstances it was erroneous, and prejudicial to the defendant's rights. It was furthermore not in harmony with the main charge, which submitted to the jury, as a question to be determined from the evidence, whether or not, in inflicting the blows, it was the intention of the defendant to kill or inflict serious bodily injury. The special charge, in a great measure, supplied this question of fact with a presumption of the law, and that, too, without explaining that this presumption of the law was not a conclusive one, but that it might be removed by other evidence showing an absence of such criminal intent. The *intent* with which the wounds were inflicted was a most vital issue to the defendant. Upon this pivot hung his fate. In the main charge this issue was properly submitted to the jury to be determined by them from the evidence, without the aid of any presumption of law, except that the defendant should be presumed innocent until his guilt was established by competent evidence. Here, we think, upon this issue, the charge should have rested.

Presumptions of law which are against a defendant should not ordinarily be given in charge to the jury. There are exceptional cases in which it is proper to cast into the scales against the defendant such presumptions, but the case before us is not one of that character. In *Gatlin* v. *The State*, 5 Texas Ct. App., 531, the court in its main charge instructed the jury upon the issue of intent as affected by the instrument or means used by which a homicide was committed. The charge given in that case was held by this court to be correct, but upon comparing it with the charge given in this case, it will be found to be quite different and not objectionable when applied to the facts of that case.

We are of the opinion that the facts of this case are of a character which demanded of the trial court a full and correct charge upon justifiable homicide in self-defense, and also a full and correct charge upon the issue of the defendant's intent in inflicting the

wounds, leaving the jury to determine that intent from the evidence in the case, without incumbering such determination with any arbitrary presumption of the law, adverse to the presumption of innocence. Believing that he has not had the benefit of such a charge, and that thereby his rights have probably been prejudiced, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered February 11, 1885.]